## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CRYPTO FREEDOM ALLIANCE OF
TEXAS and BLOCKCHAIN
ASSOCIATION,

*Plaintiffs*,

v.

SECURITIES AND EXCHANGE
COMMISSION and GARY GENSLER, in
his official capacity as Chairman of the
Securities and Exchange Commission,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Crypto Freedom Alliance of Texas and Blockchain Association, by and through undersigned counsel, bring this complaint for declaratory and injunctive relief against Defendants Securities and Exchange Commission and Gary Gensler, in his official capacity as Chairman of the Commission, alleging as follows:

## INTRODUCTION

1.      Over the past two decades, the digital assets industry has emerged as a thriving, pioneering component of the economy.  Through the development of novel, decentralized network technology, the industry has created an entirely new model of trading, with transparent and predictable rules of the road, minimized transaction costs, and no need for the middlemen that permeate the traditional financial markets.  At its core, the industry has achieved this by building the new model on distributed ledgers—decentralized networks (such as blockchains) that record and publish the history and details of digital asset transactions—and relying on open-source software to facilitate trading.

2.      This new decentralized form of finance offers numerous advantages over the inherently centralized traditional financial markets.  For example, the use of distributed ledgers maximizes transparency.  The protocols and "smart contracts" that underpin distributed ledgers are built using open-source software that participants can freely inspect, allowing a trader to know exactly how and when a transaction will be executed and at what costs.  Every transaction is recorded on a distributed ledger, and that historical record is publicly available and cannot be altered by anyone.  Distributed ledgers are also highly accessible.  You do not need a bank or brokerage account to trade—only an internet connection.  And unlike traditional financial markets, participants can trade instantly and directly without having to rely on the discretion and infallibility of middlemen.

1

3.      As with any nascent market, ensuring sufficient liquidity for digital assets can be a challenge.  But the digital assets industry has also developed novel solutions to address this challenge—most notably, "liquidity pools" that crowdsource digital assets into a single location open to market participants.  These pools enable any user to trade a digital asset he or she holds for any other asset held by the pool.  The pools are entirely transparent as to their available assets and prices at any given moment, and they are moderated by open-source software that is coded to automatically adjust prices as the makeup of assets in the pools shift and distribute proportional fees to the contributors.  And to incentivize contribution, users receive passive income when they place their digital assets into these pools.

4.      In February 2024, the Commission adopted a rule that, while nominally aimed at participants in traditional financial markets, threatens to bulldoze these innovations and potentially much of the burgeoning digital assets industry.  The rule radically expands the Commission's interpretation of the statutory term "dealer"—enacted as part of the original Securities Exchange Act of 1934—in a way that could potentially encompass digital assets industry participants that do not engage in any conduct resembling "dealing," as that term has ever been understood.  In conventional securities markets, dealers provide critical services to their customers, including advising customers, clearing and safekeeping their assets, and setting prices by market making.  Those services are undeniably important, but because there is often a significant information and financial disparity between a dealer and its customers, a dealer gone bad can cause significant harm.  So Congress required extensive regulation of dealers to protect customers; for example,

dealers must register with the Commission, provide mandatory disclosures to customers, meet financial responsibility requirements, become members of a self-regulatory organization, and participate in an insurance fund to protect customers. But decentralized finance inherently avoids those risks by removing the intermediary and the ensuing information and financial disparities altogether. It relies on neutral, transparent software to facilitate trades, not dealers.

5.     For the roughly nine decades after the Exchange Act was passed in 1934, individuals and firms have shared a common understanding of who is acting as securities "dealers" for purposes of the Act's regulatory requirements. That term has encompassed individuals or firms that, among other things, hold themselves out to customers as willing to buy and sell securities, using their own inventories to provide those customers with liquidity. Because the inquiry focuses on the type of business or services offered to one's customers, market participants have thus known in advance whether they must register as dealers and comply with the corresponding regulatory requirements.

6.     That all changed two months ago. The Commission, by a 3-2 vote, finalized a new rule that purports to expand the definition of the statutory term "dealer" in unclear ways that squarely conflict with the statute. *Further Definition of "As Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*, 89 Fed. Reg. 14,938 (Feb. 29, 2024) ("Dealer Rule"). The rule scraps the longstanding, well-settled approach that market participants relied on—which identified dealers solely based on the types of services that they provided to customers—in favor of a far broader, amorphous standard that considers whether a

3

person's trading activity regularly has the *effect of providing liquidity*.  It states that market participants will meet that new standard when they (i) "regularly express[] trading interest" "at or near the best available prices" for a security "on both sides of the market" or (ii) "earn[] revenue primarily from capturing" the spread on securities prices or "incentives offered by trading venues" for providing liquidity.  In other words, whether someone is a dealer no longer turns on *ex ante* considerations of the services a person offers to customers, but instead on an after-the-fact assessment of the *effects* of a market participant's trading activity.  That new, amorphous standard is entirely detached from the concept of "dealer" as used in the Exchange Act and understood by the Commission since 1934, and has already sown confusion in the traditional financial markets.

7.      But the Dealer Rule is even worse as applied to the digital assets industry.  Because of the rule's, exclusive focus on *post hoc* effects of trading, the new definition of "dealer" will potentially sweep in all manner of digital asset markets participants, including users who merely participate in digital asset liquidity pools.  But imposing the existing dealer regulatory framework on the digital assets industry makes little sense.  That framework does not address or mitigate the potential risks of trading using digital asset technology; it focuses on matters such as customer sales practices and asset custody that have no relevance in that context.  And the rule, which on its face was focused on participants in traditional financial markets, created many other questions about how it could practically apply in the digital asset markets.

8.      Despite a highly compressed, 39-day period for comment, digital assets industry stakeholders pointed all of this out to the Commission in numerous comments on

the proposed rule.  They explained, among other things, how the expanded definition of dealer made no sense as applied to the digital assets industry when the "market maker" that sets prices is an automated software protocol running on a distributed ledger, rather than a person or firm acting as a market intermediary.  They also raised questions as to whether the sweeping language of the new definition would encompass passive contributors to liquidity pools, leading to the absurd result that traders simply contributing their idle assets to these decentralized pools would be forced to register as securities dealers.  And the commenters emphasized that all this uncertainty was compounded by the significant questions around which digital asset transactions constitute "securities" transactions, and how various aspects of dealer regulation could even apply to digital assets as a practical matter.

9.     Commenters also identified broader costs that the rule could impose if applied to the digital assets industry.  They explained that the rule could harm competition by discouraging participation in certain trading protocols, or could even impose a significant impediment to other digital asset applications that connect to those protocols to enable internet commerce without intermediation by large, centralized technology companies.  The proposed rule had not considered any of these broader costs; the focus of the Commission's economic analysis of the effects of the proposed rule was almost entirely on the need for further regulation of the U.S. Treasuries markets and the conduct of proprietary trading firms and hedge funds.  Commenters thus urged the Commission to, at a minimum, exempt digital assets from the rule's new criteria.

10.     In the final Dealer Rule, the Commission responded to these questions and concerns from the digital assets industry with, at most, a shrug.  Rather than substantively engage with these concerns, the Commission dismissed them.  The Commission simply speculated that the rule's impact on the digital assets industry—an industry built on entirely novel technologies enabling decentralized trading and market liquidity solutions that have no equivalent in traditional finance—would be similar to its effect on traditional financial markets.  And when it came to its statutorily required economic analysis, the Commission simply threw up its hands, concluding without explanation that assessing the impact of its rule on the digital assets industry would be too difficult.  As Commissioner Peirce put it in voting against adopting the Dealer Rule, the "rule reflects little thought regarding its practical application in the crypto markets" at all.  Hester M. Peirce, *Dissenting Statement* (Feb. 6, 2024), https://www.sec.gov/news/statement/peirce-statement-dealer-trader-020624#_ftnref3.  In short, the Commission inexplicably refused to exempt the digital assets industry *or* to coherently explain how and when the rule would apply to those novel markets.

11.     In taking this approach, the Dealer Rule represents simply the latest example of the Commission's attempts to thoughtlessly apply rules geared toward traditional financial markets to the digital assets industry, despite its entirely different market structure built on innovative new technology.  The rule not only impermissibly seeks to advance the Commission's policy aims by redefining the boundaries of its statutory authority set by Congress, but threatens untold impact on digital assets industry stakeholders that the Commission barely acknowledged, let alone reasonably considered.

12.    Because the Dealer Rule exceeds the Commission's statutory authority and represents arbitrary and capricious decisionmaking, this Court should set it aside.

## PARTIES

13.    Plaintiff Crypto Freedom Alliance of Texas (CFAT) is a 501(c)6 non-profit organization, with its principal place of business in Fort Worth and its mailing address at 5601 Bridge Street, Suite 300, Fort Worth, Texas, 76112.  CFAT is comprised of member companies, including members in the Northern District of Texas, who are focused on developing products or software using digital assets technology.  CFAT advocates for the responsible development of digital assets policies in Texas—a growing economic hub for the digital assets industry—to foster innovation and economic growth while protecting consumers.  CFAT believes that blockchain technology will pave the way for the next generation of the internet, and that Texas should play a leading role in developing appropriate and workable digital assets policies to benefit Texans and all Americans.

14.    Plaintiff Blockchain Association (BA) is a 501(c)6 nonprofit organization with nearly 100 members, including  members in the Northern District of Texas.  As the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital assets economy, BA is comprised of leading software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.  BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, and the courts about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace.  BA is dedicated to fostering a thoughtful public policy environment for public blockchain networks so that they can develop and prosper in the United States.

15.     Plaintiffs bring this action on behalf of their members to safeguard their interests, as well as the interests of the entire digital assets industry and American consumers.  Plaintiffs are concerned with the sweeping and arbitrary nature of the Dealer Rule, which is the latest attempt by the Commission to indirectly regulate the digital assets industry by trying to stretch existing law in ways that are ill-suited and create uncertainty as applied to the industry.

16.     If the Dealer Rule goes into effect, Plaintiffs' members and other participants in the digital asset markets that merely trade digital assets will potentially be subject to onerous regulations and compliance costs as "dealers," depending on the Commission's piecemeal, arbitrary approach to classifying transactions in certain digital assets as securities transactions.  Those that cannot meet all of those dealer compliance requirements will be forced to either cease trading altogether or be subject to Commission enforcement actions.  Similarly, Plaintiffs' members that develop the decentralized software and infrastructure that enables trading of digital assets without a financial intermediary will suffer harm.  Not only will the risk of being labeled "dealers" cause traders to shift away from using these innovations, but the vague terms of the Dealer Rule would even seem to make the software itself (or those software developers who develop and maintain it) potentially subject to registration as a dealer—an absurd result that the Commission refused to address.  All of this will have disastrous effects for the entire digital assets industry.

17.     For these and other reasons, Plaintiffs' members strongly opposed the Dealer Rule.  *See, e.g.*, a16z Comment at 3 (May 27, 2022) ("By requiring domestic market

participants to sort out these costly compliance questions that even the Commission has, to date, failed to answer, and possibly undergo the onerous dealer registration process, the Commission risks driving them out of the market altogether.  Those that stay will likely find themselves saddled with costs.").

18.     Defendant Securities and Exchange Commission is a federal government agency charged with securities regulation.  It is subject to the Administrative Procedure Act (APA) pursuant to 5 U.S.C. § 551(1).

19.     Defendant Gary Gensler is the Chair of the Commission.  He is sued in his official capacity and is also subject to the APA pursuant to 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action under the APA, 5 U.S.C. § 500 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

21.     Plaintiffs have associational standing to bring this suit on behalf of their various members.  Their members are directly and adversely affected by the Dealer Rule, including because of the regulatory uncertainty that they now face, and accordingly have standing to sue in their own right.  The interests Plaintiffs seek to protect are germane to their purposes, and neither the claims asserted nor the relief requested requires an individual member to participate in the suit.  *See Ass'n of Am. Physicians & Surgeons, Inc.* v. *Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and officer of the United States, no real property is involved,

and Plaintiff CFAT resides in this district.  Venue is proper in this division because Plaintiff CFAT resides in this division.

## FACTUAL BACKGROUND

### A.    The Digital Assets Industry

23.    Digital assets are "digital representations of value."  Eva Su, *Digital Assets and SEC Regulation*, CONG. RESEARCH SERV., at I (June 23, 2021), https://crsreports.congress.gov/product/pdf/R/R46208.  Comprised of cryptocurrencies, digital tokens, and other representations of value like digitized art, gold, and loyalty points, the digital asset markets are emerging as important and growing contributors to global economic growth, having ended March 2024 as a $2.7 trillion market.  *See Digital Assets Dashboard*, FINANCIAL TIMES (accessed on Apr. 22, 2024), https://digitalassets.ft.com.

24.    Evolving from a mere concept in a 2008 whitepaper by an anonymous inventor, digital assets are today an ordinary facet of modern life and an institutionally supported asset class.  *See* Kathleen Breitman, *Why Satoshi Nakamoto is smiling at BlackRock's embrace of Bitcoin*, FORTUNE CRYPTO (Jan. 20, 2024), https://fortune.com/crypto/2024/01/20/why-satoshi-nakamoto-is-smiling-at-blackrocks-embrace-of-bitcoin.  A February 2023 survey found that 20% of adult Americans owned digital assets. *New survey of 2,000+ American adults suggests 20% own crypto*, COINBASE (Feb. 27, 2023), https://www.coinbase.com/blog/new-national-survey-of-2-000-american-adults-suggests-20-of-americans-own; *see also FACT SHEET: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets*, THE WHITE HOUSE (Sept. 16, 2022) (estimating that 16% of adults owned digital assets in 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-

10

sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets.  Many "[h]ousehold" companies "now accept payment in one or more digital currencies."  Consensys Comment at 3 (May 26, 2022).  And many financial advisors recommend "long-term investment[s]" in digital assets as part of Americans' investment portfolios, given their overall status as an important new asset class.  Carmen Reinicke, *You should have cryptocurrency in your portfolio, no matter your age, advisors say*, CNBC (Dec. 9, 2021), https://www.cnbc.com/2021/12/09/you-should-have-crypto-in-your-portfolio-no-matter-your-age.html.

25.    Because transactions involving digital assets do not need to rely on centralized, traditional financial intermediaries (such as banks, brokers, and clearinghouses), a wide range of digital asset activity has become known under the umbrella of decentralized finance or DeFi.  Academic research shows that DeFi has significant benefits over traditional financial infrastructure, including increased efficiency, transparency, and financial accessibility.  *See, e.g.*, Fabian Schär, *Decentralized Finance: On Blockchain- and Smart Contract-Based Financial Markets* 168-169, Fed. Reserve Bank Of St. Louis R. (Second Quarter 2021), https://files.stlouisfed.org/files/htdocs/publications/review/2021/04/15/decentralized-finance-on-blockchain-and-smart-contract-based-financial-markets.pdf.

**B.    The Financial Innovations Unique to Decentralized Finance**

26.    A number of financial innovations underpinning DeFi have no immediate analogues in traditional financial infrastructure.  These innovations drive some of the benefits DeFi offers as compared to traditional financial infrastructure, including reduced counterparty credit risk, 24/7 liquidity, low costs, fast settlements, equitable market access,

and enhanced transparency created by centralized and immutable transaction data.  DeFi Education Fund (DEF) Comment at 4-6 (May 27, 2022).

### 1.    Distributed Ledger Technology and Smart Contracts

27.    Digital assets typically are "issued and transferred using distributed ledger or blockchain technology."  Su, *Digital Assets and SEC Regulation*, *supra* ¶ 23, at 1.  In its simplest sense, a distributed ledger (such as blockchain) is a decentralized network that records and publishes transaction information to every node in the network without the need for any third-party intermediary.  *See Blockchain basics:  Introduction to distributed ledgers*, IBM (June 1, 2019), https://developer.ibm.com/tutorials/cl-blockchain-basics-intro-bluemix-trs/.

28.    Software programs built onto distributed ledgers, known as smart contracts, facilitate the trading of digital assets.  *See* DEF Comment at 4.  These programs are based on open-source code, which is not controlled by a single person or entity, and enable anyone with an internet connection to buy or sell digital assets.  *Id.*  A person wishing to transact on a distributed ledger utilizes the smart-contract software, which automatically executes the transaction without any need to identify a specific counterparty or involve a third-party intermediary.  *Id.*

### 2.    Liquidity Pools and Automated Market Maker Software

29.    The DeFi ecosystem has developed creative ways to facilitate liquidity in digital assets.  These innovations were needed because early digital asset markets "had fewer buyers and sellers" than traditional markets and by design lacked third-party intermediaries to match buyers and sellers as counterparties to transactions.  DEF Comment at 6.

30.     To enhance liquidity, the DeFi ecosystem invented the concept of a liquidity pool, an "innovation" that has "no immediate equivalent in traditional finance."  Ekin Genç, *What Are Liquidity Pools?  The Funds That Keep DeFi Running*, DECRYPT (Mar. 2, 2023), https://decrypt.co/resources/what-are-liquidity-pools-the-funds-that-keep-defi-running.  A typical liquidity pool crowdsources relevant digital assets from a distributed ledger's users and commits those assets to the pool's smart contract, making those assets available for trading.  *See* DEF Comment at 6.  When a buyer or seller of a digital asset wants to transact, the liquidity pool provides the relevant assets for the transaction.  *Id.*

31.     Through the use of a mathematical formula built into the pool's smart contract—known as automated market maker (AMM) software—the prices of the remaining assets in the pool increase or decrease after each transaction based on supply and demand.  Genç, *What Are Liquidity Pools?, supra* ¶ 30.  For example, if a user holding Digital Asset A wants to buy Digital Asset B, the user contributes Digital Asset A to the pool and receives Digital Asset B from the pool.  *Id.*  The AMM software then automatically adjusts the prices of the two digital assets accordingly—*i.e.*, decreasing the price to transact in the more-plentiful Digital Asset A and increasing the price to transact in the less-plentiful Digital Asset B going forward.  *Id.*  Thus, "by leaving their assets in the pool," users "expos[e] those assets to sale at the pool's prevailing exchange rate," which changes on a transaction-by-transaction basis as dictated by the AMM software.  DEF Comment at 8.  Unlike in traditional financial markets where market makers set prices on both sides of the market based on the availability of buy and sell orders from traders, AMM software fosters automatic price discovery on the relevant assets in the pool.  And to help maintain stability

across different pools in the market, other automated software programs—known as "arbitrage bots"—are programmed to purchase assets in one decentralized protocol and deposit them in another when warranted in response to differential pricing. A16z Comment at 5.

32.    To incentivize participation in liquidity pools, users that contribute their assets to the pool receive liquidity provider tokens. DEF Comment at 7. These tokens provide users with the right to reclaim their assets and the fees they have earned when they return those tokens to the pool. *Id.* The users that participate in the pool typically are nothing like market makers in traditional finance who set and quote prices; they are simply traders who decide to earn a return on idle digital assets by contributing those assets to the pool and relying on AMM software to set prices. *Id.*

33.    Without liquidity pools, DeFi would not be as efficient or as robust of a financial system because digital asset markets would be less liquid. But largely because of the tremendous success of these pools, as of the end of March 2024, the amount of total DeFi liquidity was close to $100 billion. *Total Value Locked*, DEFILLAMA (measuring "total value locked," which is an indicator of liquidity) (accessed on Apr. 1, 2024), https://defillama.com/.

## REGULATORY BACKGROUND

34.    Digital assets can be categorized as "securities, currencies, properties, or commodities." Su, *Digital Assets and SEC Regulation*, *supra* ¶ 23, at 1. Because of the differences in asset categorizations, members of the digital assets industry might find themselves regulated by the Commission (securities), the Commodity Futures Trading

Commission (currencies and commodities), or the Internal Revenue Service (property), among other agencies. *Id.* at 6.

35.     For its part, the Commission has never definitively stated which types of digital asset transactions it believes are securities transactions, which has caused significant uncertainty for the digital assets industry.  Instead, the Commission has taken an *ad hoc* approach to categorizing specific digital assets as securities, either through broad statements by individual Commissioners or through piecemeal enforcement actions and lawsuits.  For example, Chairman Gensler has publicly stated that Bitcoin is a commodity, not a security.  Stephen Graves, *Is Ethereum a Security?  SEC Chair Gary Gensler Defers on the Question*, DECRYPT (Mar. 7, 2024), https://decrypt.co/220545/sec-chair-gary-gensler-ethereum-security.  In contrast, he has refused to say whether Ethereum is a security, *id.*, despite a statement from the former director of the Commission's Division of Corporation Finance that Ethereum is *not* a security, William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC, (June 14, 2018) ("[C]urrent offers and sales of Ether are not securities transactions."), https://www.sec.gov/news/speech/speech-hinman-061418.  Outside of Bitcoin and Ethereum, the Commission has filed a bevy of enforcement actions and lawsuits against members of the digital assets industry, alleging that these members were engaged in illegal, unregistered transactions in assets the SEC alleged to be securities for the first time in these lawsuits.  *See, e.g.*, Peter Santilli et al., *U.S. Exchanges List More Than a Dozen Cryptos the SEC Says Are Illegal to Sell*, WALL ST. J. (May 8, 2023), https://www.wsj.com/articles/u-s-exchanges-list-more-than-a-dozen-cryptos-the-sec-says-are-illegal-to-sell-6c323b4.

36.    The Commission imported that same *ad hoc*, unpredictable approach into the Dealer Rule.  Rather than give the digital assets industry clear advance notice of which digital assets might subject participants to the rule, the Commission simply warned that because transactions in unspecified "crypto assets" *can* qualify as securities transactions, users who trade those assets and meet the Rule's new "tests" might now be deemed securities "dealers."

### A.    The Securities Exchange Act of 1934

37.    The Exchange Act provides the statutory authority for federal regulation of the secondary securities markets.  The different regulatory requirements of the Act depend on the nature of the securities transaction in question, a party's role in the transaction, and how a party interacts with other market participants.

38.    The Act focuses much of its regulatory application on intermediaries involved in securities transactions.  For example, the Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of *others*."  15 U.S.C. § 78c(a)(4)(A) (emphasis added).  In other words, a broker acts as an agent, navigating the markets and buying and selling securities on behalf of clients.

39.    In contrast, the Act defines "dealer" as a "person engaged in the business of buying and selling securities . . . for such person's *own account.*"  15 U.S.C. § 78c(a)(5)(A) (emphasis added); *see also id.* § 78c(a)(44) (similarly defining "government securities dealer").  Dealers, like brokers, provide an important service to their customers, but they do so as a counterparty rather than an agent.  Using their own inventories, dealers fulfill traders' demand to buy and sell specific securities at a set price.

40.     A report by the Commission released shortly after the Exchange Act's passage underscores the key features of these intermediary roles.  A broker is "employed to execute an order for the purchase or sale of securities [as] the agent of his customer . . . solely for the account of the customer," whereas a "dealer sells securities to his customer which he has purchased or intends to purchase elsewhere or buys securities from his customer with a view of disposing them elsewhere."  SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936).  In either case, whether a party constituted a broker, dealer, or simply a trader was determined *ex ante* based on the kinds of services (if any) the party chose to offer to customers.

41.     To distinguish between dealers and ordinary traders, the definition of "dealer" specifically excludes persons buying or selling securities for their own accounts, "but not as part of a regular business."  15 U.S.C.  § 78c(a)(5)(B).  Commonly referred to as the "trader" exception, this carve-out for individuals who buy and sell securities for themselves, rather than as part of their "regular business" offered to customers or the market, has been a part of Congress's statutory scheme since the passage of the Exchange Act in 1934.

42.     Congress thus recognized the fundamentally different roles of dealers and traders.  Dealers are integral to markets.  They *make* markets by quoting and setting prices for the purchase or sale of a security, along with other services such as underwriting the issuance of securities.  It is through these services that dealers make a profit.  To the

contrary, traders *utilize* markets in an attempt to profit off of their trades; they do not set prices or underwrite securities.

43.      Given the importance of dealer services and potential for abuse due to their information disparity and pricing power, Congress subjected dealers to a comprehensive regulatory framework to protect investors. *See* The Twentieth Century Fund, *The Security Markets:  Findings and Recommendations of a Special Staff of the Twentieth Century Fund* 267 (1935) ("It is easy to see that there is considerable opportunity for exorbitant charges [by dealers] . . . [and] no good check on the prices reported to customers."). Dealers must register with the Commission and comply with extensive regulations. *See* Division of Trading and Markets, SEC, *Guide to Broker-Dealer Registration* (Apr. 2008), https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration.   That includes compliance with recordkeeping requirements, 17 C.F.R. § 240.17a-4, and maintaining a certain amount of capital on hand as part of the net capital requirements, *id.* § 240.15c3-1.  Dealers also have various disclosure obligations, including providing certain mandated notices to customers, such as whether the "dealer" is "a market maker" in a specific security, *id.* § 240.10b-10(a)(2), and notice of the "material fees and costs" associated with a customer's transactions, *id.* § 240.15l-1(a)(2)(i)(A)(2).   The Commission also requires that dealers become members of the Financial Industry Regulatory Authority (FINRA), a self-regulatory organization that imposes its own additional conduct rules and assesses new-member fees, which can exceed tens of thousands of dollars.  *See* FINRA, *Schedule of Registration and Exam Fees* (July 23, 2012), https://www.finra.org/registration-exams-ce/classic-crd/fee-schedule.  And on top of that,

registered dealers must join and contribute to the Securities Investor Protection Corporation (SIPC), a fund that provides up to $500,000 in insurance for a customer's account in the event that a broker-dealer holding customer assets goes bankrupt or falls into financial trouble. *See* 15 U.S.C. § 78ccc. The compliance costs associated with all of these requirements run well into the hundreds of thousands of dollars per year.

44.     Despite amending the federal securities laws numerous times over the past century, Congress has never revisited the definition of dealer, nor its well-established "trader" exception.

### B.     The Longstanding Understanding of "Dealer" by Other Branches of Government

45.     For decades, the Commission and the courts have shared a common understanding of the dealer–trader distinctions Congress created: that the Exchange Act's definition of "dealer" turns on whether a party holds itself out to *customers* in the market as willing to buy and sell securities in order to profit off of fees and price spreads associated with those transactions.

#### 1.     *The Commission*

46.     The Commission's own guidance and staff no-action letters over the past 50 years have consistently looked to *ex ante* factors focused on the kinds of services a party offers to customers in deciding who must register as a dealer. Until its sharp departure in the Dealer Rule at issue here, the Commission had historically applied the same basic *ex ante* test for determining who constitutes a dealer in different types of securities, based on the specific facts and circumstances of the markets for those different securities.

47.     For example, in 1975, the Commission provided guidance to the municipal securities industry, explaining that activities such as "underwriting," "carrying a dealer inventory," "advertising or listing as a dealer," or "otherwise holding [one]self out to other dealers or investors as a dealer" all indicate that a person is acting as a dealer.  SEC Release No. 34-11742, 1975 WL 163406, at *3 (Oct. 15, 1975); *see also* United Trust Company, SEC Staff No-Action Letter, 1978 WL 13781, at *2 (Aug. 7, 1978) ("The Company's apparent willingness to continue to engage in such municipal securities activity when requested to do so by customers suggests that the Company is 'engaged in the business.'").

48.     Then, in the 1980s, staff took the same approach when the Commission's jurisdiction expanded to cover government securities, such as U.S. Treasuries. *See* Continental Grain Co., SEC Staff No-Action Letter, 1987 WL 108902, at *10 (Oct. 28, 1987) ("As a general matter, a trader does not handle other people's money or securities; he does not hold himself out as being willing to buy and sell securities for his own account on a continuous basis; and he does not furnish the services which are usually provided by such dealers, such as quoting the market in one or more securities, rendering incidental investment advice, or extending or arranging for the extension of credit in connection with securities activities.") (citation omitted); *see also* Louis Dreyfus Corp., SEC Staff No-Action Letter, 1987 WL 108160, at *2 (July 23, 1987); *In the Matter of the Application of Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sept. 2, 1992).

49.     The Commission did the same in the 1990s for over-the-counter derivatives, following the growth of that market.  OTC Derivatives Dealers, Exchange Act Release No. 34-40594, 1998 WL 745950, at *15 n.61 (Oct. 23, 1998) (explaining that activities that cause

someone to constitute a "dealer" include, for example, "(1) purchasing or selling securities as principal from or to customers; (2) carrying a dealer inventory in securities (or any portion of an affiliated broker-dealer's inventory); (3) quoting a market in or publishing quotes for securities . . . in connection with the purchase or sale of securities permitted under Rule 15a-1; (4) holding itself out as a dealer or market-maker or as being otherwise willing to buy or sell one or more securities on a continuous basis," and other similar activities).

50.     The Commission again took this same approach when implementing major pieces of financial legislation over the past two decades.  In 2002, in its proposed rulemaking to implement the Gramm-Leach-Bliley Act, the Commission explained that, "[a]s developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business . . . , and generally transact a substantial portion of their business with investors." *Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934*, 67 Fed. Reg. 67,496, 67,498 (Nov. 5, 2002).

51.     And in implementing the Dodd-Frank Wall Street Reform Act, the Commission endorsed this same multi-factor framework for delineating the "dealer-trader distinction" in guidance concerning security-based swaps. *See Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant"*, 77 Fed. Reg. 30,596, 30,607-30,608 (May 23, 2012) (identifying "having a regular clientele and actively advertising or

21

soliciting clients in connection with swaps" as part of the collective set of conduct "indicative of dealing activity").

52.     The Commission has never provided any similar prospective guidance to the digital assets industry.  Despite multiple requests for clarification of how the securities laws—including the "dealer" test—apply to this new market, the Commission has refused to provide such guidance.  *See, e.g.*, Pet. Br. 1, *In re COINBASE, INC.*, No. 23-1779 (3rd Cir. 2023) (mandamus action to require Commission "to act on Coinbase's pending rulemaking petition to provide clarity" as to how the securities laws apply to "the crypto industry").  Chairman Gensler has even opposed several legislative efforts to clarify regulatory jurisdiction over digital assets.  *See, e.g.*, Kollen Post, *Current crypto legislation 'undermines' the SEC, Gensler says*, THE BLOCK (Nov. 9, 2022) ("There's some legislation on the Hill I do not think meets the test. . . . I think it undermines the securities laws."), https://www.theblock.co/post/185024/current-crypto-legislation-undermines-the-sec-gensler-says; Ephrat Livni & Matthew Goldstein, *Even After FTX, S.E.C. Chair Sees No Need for New Crypto Laws*, N.Y. TIMES (Dec. 22, 2022) (explaining that Chairman Gensler is "wary of bills that could undermine the S.E.C.'s authority" because he believes existing law is "robust and covers much of the activity" in question), https://www.nytimes.com/2022/12/22/business/gary-gensler-sec-crypto.html?smid =nytcore-ios-share&referringSource=articleShare.

### 2.     *The Courts*

53.     Dating back to the 1930s, courts have likewise understood that a "dealer in securities" is "one who, as a merchant, buys and sells securities to customers for the profit thereon."  *Schafer* v. *Helvering*, 299 U.S. 171, 173 (1936) (citation omitted).  Since then,

courts have continued to look to the same type of *ex ante*, customer-facing conduct to determine who constitutes a dealer.

54.    For example, the Second Circuit has explained that: "[b]roker-dealers effect securities transactions for *customers*, for which they typically charge a commission or other transaction-based fee.  In connection with their services, broker-dealers often provide advice and make recommendations about securities transactions and investment strategies." *XY Plan. Network, LLC* v. *SEC*, 963 F.3d 244, 248 (2d Cir. 2020) (emphasis added) (citations omitted).

55.    This Court has also explained that "[t]o be considered a dealer, a person must be engaged in the securities business, such as soliciting investor clients, handling investor clients' money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." *Chapel Invs., Inc.* v. *Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016).  "These factors," the Court recognized, "'distinguish the activities of a dealer from those of a private investor or trader.'" *Id.* at 990-991 (quoting *In re Sodorff, Jr.*, 1992 WL 2240, at *5 n.27).

56.    Other courts have embraced this same understanding of how to identify a dealer. *See, e.g.*, *Discover Growth Fund, LLC* v. *Camber Energy, Inc.*, 602 F. Supp. 3d 982, 989 (S.D. Tex. 2022) ("Whereas an investor or trader may buy securities from issuers at substantial discounts and resell them into the public market for a potentially significant profit, a dealer buys and sells securities from its *customer* and to its *customer* for a relatively small markup or fixed commission.") (emphasis added); *In re Immune Pharms.*

*Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) ("[A] dealer buys and sells securities from its customer and to its customer.").

57.     In short, for nearly a century, Congress, the Commission, and the judiciary have uniformly understood that whether a person qualifies as a dealer should be determined on an *ex ante* basis, based on the services the person offers to customers.  That all changed in the Commission's present attempt to revamp that longstanding definition.

## THE COMMISSION'S DEALER RULEMAKING

58.     Breaking from this consistent historical approach spanning nine decades, a sharply divided 3-2 majority of the Commission adopted an expansive new interpretation of the Exchange Act's definition of "dealer" that cannot be squared with that statute.  But even worse than that flaw, with seemingly little thought given to its practical application, the new definition would seem to designate as securities dealers countless persons in the digital asset markets who engage in critical, novel forms of trading, and even the technological innovations (and software developers of those innovations) that facilitate such trading and liquidity provision.  The term "dealer" has never been stretched so far, and it cannot be applied to market participants and technologies that engage in conduct bearing no resemblance whatsoever to "dealing" activity as that word has ever been understood.

### A.     The Proposed Dealer Rule

59.     On April 18, 2022, the Commission issued its proposed rule expanding the meaning of "dealer" under the Exchange Act.  *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054 (Apr. 18, 2022) ("Proposed Rule").

60.    Under the Proposed Rule, a market participant would be required to register as a "dealer" if it "[e]ngage[d] in a routine pattern of buying and selling" securities or government securities "that ha[d] the effect of providing liquidity to other market participants."  Proposed R. at 23,064-23,065.  The Proposed Rule introduced three brand new qualitative tests for determining whether a market participant's trading purportedly "ha[d] the effect of providing liquidity":

- "Routinely making roughly comparable purchases and sales of the same or substantially similar securities (or government securities) in a day";

- "[R]outinely expressing trading interests that are at or near the best available prices on both sides of the market and that are communicated and represented in a way that makes them accessible to other market participants"; or

- "[E]arning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interests."

*Id.* at 23,065.

61.    The Proposed Rule was focused on certain participants in traditional financial markets.  But it contained one isolated reference to digital assets in a single footnote.  That footnote stated that the proposed new tests would apply to "any digital asset that is a security or a government security within the meaning of the Exchange Act."  Proposed R. at 23,057 n.36.   The Proposed Rule contained no discussion whatsoever of which transactions in which digital assets constitute securities transactions, or how (or why) the

Proposed Rule would apply to trading in digital assets—including any analysis of the unique trading protocols used in the digital assets industry.  Nor did it contain any economic analysis of the Proposed Rule's costs or benefits on the digital assets industry.

62.     The Commission set a deadline of May 27, 2022, for any comments on the Proposed Rule.

### B.     The Digital Assets Industry Raises Concerns

63.     Despite the rushed comment period for this complete reinterpretation of a foundational statutory term—only 39 days from when the Proposed Rule was published in the Federal Register—numerous members of the public submitted comments to raise concerns about the Proposed Rule.  As particularly relevant here, in response to the lone, vague reference to the proposal's potential application to digital asset market participants, numerous members of the digital assets industry submitted comments raising serious concerns and objections to the Proposed Rule.

64.     At the outset, digital assets industry members objected that the single mention of digital assets in a footnote provided clearly insufficient notice of how and why the Commission intended to apply the rule to the digital asset markets.  *See, e.g.*, DEF Comment at 11; Chamber of Digital Commerce Comment at 4 (June 13, 2022) ("[I]t is completely unclear whether the Commission proposes that the term 'dealer' now include digital asset or cryptocurrency market participants since there is no reference to digital asset market intermediaries anywhere in almost 200 pages of regulatory discussion and not one request for comment relates to the impact of the Proposal[] on the digital asset industry.").  The single footnote was particularly lacking because the Commission, consistent with its longstanding, unlawful approach to the industry more generally, had

provided no clarity as to which transactions in which digital assets constitute securities transactions. *See, e.g.*, a16z Comment at 10 ("[T]he Commission should not compound the costs of uncertainty over the status of digital assets through a single sentence in a footnote of the Proposal."); BA Comment at 1 (May 27, 2022) ("[T]he Proposal exacerbates the harmful impact of existing regulatory uncertainty caused by the SEC's failure to provide adequate guidance regarding the classification of digital assets as securities.").

65.     Despite that insufficient notice, digital assets industry commenters urged the Commission to consider numerous concerns, questions, and objections to the Proposed Rule. As one commenter explained, "[a]lthough the Proposal's treatment of digital assets is less than superficial, its implications—mandating that an entire burgeoning industry be subject to onerous registration requirements on the basis of a single footnote reference—are massive." DEF Comment at 12.

66.     Like many other commenters, the digital assets industry explained that the Commission had exceeded its statutory authority by "effectively eliminat[ing] the statutory 'trader' exclusion to the 'dealer' definition," which would have far-ranging implications for digital asset markets in particular. *See, e.g.*, BA Comment at 1; DEF Comment at 9-11; Consensys Comment at 8-14.

67.     Digital assets industry stakeholders also raised significant and unique concerns about how the Proposed Rule would apply to the industry. For example, commenters raised concerns that the Proposed Rule's "breadth and ambiguity . . . raise many questions about the [registration] status" of market participants in light of the unique features of DeFi, such as AMM software, that are designed to facilitate liquidity in digital

asset markets.  DEF Comment at 7; *see also* Consensys Comment at 6 ("[N]othing in the proposal displays awareness of, let alone grapples with, the unique structures of [decentralized exchanges]."); a16z Comment at 3 ("[T]he Proposal does not address the novel ways in which individuals can provide liquidity for digital assets in DeFi systems."); BA Comment at 4 ("Even if certain digital assets are to be deemed securities, the SEC has provided no type of definitive guidance about how this dynamic, innovative, and fast-growing sector can comply with the various requirements of the securities laws, which were designed for the traditional securities markets—markets that are different from the digital asset sector.").

68.  One commenter spelled out very specific and pointed questions raised by the Proposed Rule:

- "All participants in a liquidity pool are, by leaving their assets in the pool, exposing those assets to sale at the pool's prevailing exchange rate.  Does this translate to all participants expressing a 'trading interest'?  If so, given that a single, fluctuating exchange rate sets the price, would such interest always be 'at or near the best available prices on both sides of the market'?  Might all participants in a liquidity pool then be engaged in dealing activity?"; and

- "Participants in a liquidity pool receive [liquidity provider tokens] for their participation.  Would this constitute an 'incentive . . . for liquidity-supplying trading interests'?"

DEF Comment at 8.

69.     Multiple commenters also raised concerns that the Dealer Rule "may well drive firms to cease providing the very liquidity the safeguarding of which is the proposal's asserted core purpose." Consensys Comment at 17-18. This is because market participants "have choices regarding where and how they trade," and the ambiguities surrounding which types of DeFi innovations (such as liquidity pools and AMMs) would trigger the Dealer Rule's tests would lead traders to avoid DeFi protocols with those features. DEF Comment at 8; *see, e.g.*, *id.* at 9 ("[I]t would be rational for an investor instead to transact through an execution protocol and market structure that did not subject it to dealer registration."); a16z Comment at 10 ("[I]f market participants cannot easily evaluate their obligations under the Exchange Act and Commission rules, many will pare back their liquidity-providing activities or leave [decentralized exchanges] altogether.").

70.     The reduced liquidity in the digital asset markets would have substantial downstream consequences for all digital asset markets participants. For example, commenters raised concerns about "market concentration" amongst a "smaller group of liquidity providers," making markets more susceptible to volatility and systemic risk if the remaining liquidity providers decided to leave markets themselves. *See, e.g.*, DEF Comment at 9.

71.     Commenters also raised concerns about the ramifications that the Proposed Rule would have on innovation in DeFi and other related technologies, which would hurt everyday Americans. For example, because DeFi protocols that employ innovations like liquidity pools and AMM software might founder due to the regulatory risk brought about by the Proposed Rule, everyday "end users" might "no longer have the same access to

innovative execution protocols and may have to revert to using traditional, dealer-centric trading platforms," sacrificing the many benefits of DeFi.  DEF Comment at 13.  This in turn would "stifle innovation . . . in the nascent digital assets industry."  BA Comment at 9.  And the chill on innovation would not be limited to DeFi specifically:  as another commenter explained, the Proposed Rule "risk[ed] stopping the development of web3"—*i.e.*, next-generation internet—"in its tracks," because DeFi protocols "serve as essential building blocks of web3."  a16z Comment at 3, 6.  The end result of all of these effects could cause the innovation advantage to "shift" from the United States to "foreign jurisdictions."  *Id.* at 10.

72.    Industry members additionally explained that the Commission's myopic cost-benefit analysis in the Proposed Rule considered only the proposal's impact on traditional securities markets, while "disregard[ing] economic effects on the digital assets markets."  BA Comment at 7; *see* DEF Comment at 13 ("[W]hile the Proposal discusses the potential effects of this rulemaking on other types of entities, it gives no space to DeFi or market structure impact in its economic analysis at all."); *see also* Consensys Comment at 17 (explaining that a "single" market event "in the *Treasuries* market cannot justify applying the [Proposed Rule's] qualitative tests to traders *in all securities*.").

73.    In light of these pervasive issues and unanswered questions, commenters urged the Commission, if it decided to finalize the rule in some form, "to exempt from [the Proposed Rule's] requirements activities implicating digital assets, as there is no support for this rulemaking to apply to them."  DEF Comment at 14.  Such an exemption was particularly needed given that, due to the Commission's continuing refusal to provide broad

guidance to the industry, market participants might not even know if their digital asset trades constitute securities transactions. *See* a16z Comment at 3 ("[W]e urge the Commission to carve digital assets out of the Proposal until Congress or the Commission clarifies the status of specific digital assets and the appropriate regulatory structure for digital assets.").

### C.     The Final Dealer Rule

74.     Despite these numerous significant concerns, the Commission failed to substantively address them and nonetheless adopted a final rule that casts a shadow of regulatory uncertainty over the entire digital assets industry.

75.     On February 29, 2024, after another 3-2 vote, the Commission issued its final rule, reinterpreting the meaning of "dealer" to include any person whose trading activity "regular[ly]" has the "effect of providing liquidity" to the market.   Dealer R. at 14,943.

76.     Although the Dealer Rule made some changes to the Proposed Rule, including dropping one of the three originally proposed qualitative tests, it adopts the other two proposed tests based on the *post hoc* effect of a market participant's trading activities. In particular, the Dealer Rule establishes that any person that engages in the following activities as part of a regular business would be a "dealer":

- "Regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants"; or

- "Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest."

Dealer R. at 14,944.

77.     Market participants whose trading activity is captured by either of these two new tests are required to "register with the Commission" as a "dealer," "become members of [FINRA]," and "adhere to a comprehensive regulatory regime," including operational integrity rules, net capital requirements, books and records requirements, reporting and disclosure requirements, and antifraud and anti-manipulation provisions.   Dealer R. at 14,966-14,967.  They must also become members of and contribute to SIPC, the member-funded corporation that insures investors' assets in the event of broker-dealer insolvency. *See* 15 U.S.C. § 78ccc.

78.     Having adopted these brand new tests, however, the Commission immediately warned the public not to rely too much on them:  "[n]o presumption shall arise that a person is not a dealer . . . solely because that person does not satisfy" either of the two tests.  Dealer R. at 14,946. And the Commission claimed that the rule "do[es] not modify existing court precedent and Commission interpretations, which continue to apply to determine whether a person is a dealer, even if such person would not qualify as a dealer under the final rule[]."  *Id.* at 14,964.

79.     As for responding to the extensive concerns from the digital assets industry, the Commission punted.  It merely stated that "[t]he final rule[] appl[ies] to the buying and selling of all securities, including crypto assets that are securities or government securities

32

within the meaning of the Exchange Act." Dealer R. at 14,960. That obscure statement not only failed to address commenters' concerns; it is inconsistent with the Commission's positions in other litigation. There, the Commission has acknowledged that digital assets are not *themselves* securities, and has argued instead that the security is the purported investment contract formed when a buyer of a digital asset believes he is "investing into the network" or the "ecosystem" behind the asset—a complicated, transaction-specific analysis. *See* Tr. of Oral Argument at 21:12-22:21; 25:14-28:2, *SEC* v. *Coinbase, Inc.*, No. 23-cv-04738 (S.D.N.Y. Jan. 17, 2024); *see also SEC* v. *Coinbase, Inc.*, 2024 WL 1304037, *13 (S.D.N.Y. Mar. 27, 2024) ("[T]he SEC does not appear to contest that tokens, in and of themselves, are not securities. The appropriate question, therefore, is whether transactions in which a particular token is implicated qualify as investment contracts.") (citation omitted). In the end, declining to exclude digital assets from the Dealer Rule or provide any additional guidance as to which digital asset transactions could trigger a requirement to register, the Commission simply asserted that "[t]he dealer framework is a functional analysis based on the securities trading activities undertaken by a person, not the type of securities being traded." Dealer R. at 15,000.

80.     Similarly, rather than substantively address comments explaining the unique features of DeFi or respond to questions about whether or how the rule would apply to participants using DeFi trading protocols, the Commission simply asserted without explanation that "[t]here is nothing about the technology used, including distributed ledger technology-based protocols using smart contracts, that would preclude crypto asset securities activities from falling within the scope of dealer activity." Dealer R. at 14,960.

81.     And the Commission again focused its cost-benefit analysis almost exclusively on the U.S. Treasuries market, proprietary trading firms (PTFs) and hedge funds.  Dealer R. at 14,977-14,978.  As a purported explanation for ignoring the costs to the digital assets industry, the Commission stated that it was "unable to estimate the number of crypto asset market participants who would be affected by the rule[]." *Id.* at 14,974.  In the single instance where the Commission did mention costs to digital asset markets, the Commission gave some indication for the very first time about how net capital requirements would apply to digital assets—acknowledging that dealers holding digital assets would face uniquely higher costs and implicitly recognizing that trading in digital assets presents unique considerations. *Id.* at 14,988 & n.573.  But that was the extent of the Commission's discussion of the costs to the digital assets industry (and even in that one instance, the Commission did not attempt to justify those higher costs).

82.     The Dealer Rule is set to take effect on April 29, 2024, and the compliance date for the Dealer Rule is one year after the effective date.   Dealer R. at 14,938, 14,964-14,965.  Although commenters highlighted that the Commission's cost estimates were far too low as applied to digital asset markets participants, *see, e.g.*, BA Comment at 7-8, the Commission nonetheless ignored virtually all of these concerns and estimated that the initial cost of compliance with dealer registration across markets will be $700,000 and the ongoing cost of compliance will be $600,000 a year, in addition to other costs such as new member fees imposed by FINRA.  Dealer R. at 14,982.

## THE COMMISSION'S ADOPTION OF THE DEALER RULE VIOLATES THE APA

83.     The Dealer Rule should be set aside under the APA for several reasons.  First, the Commission exceeded its statutory authority in its sweeping new interpretation

of "dealer."  While that unlawful departure from the statutory definition will have effects across different markets, the "most pronounced" effects will be felt in the digital asset markets due to the fundamental uncertainty as to how the Rule operates with respect to the unique, innovative features of these markets.  DEF Comment at 1.  Second, in an egregious violation of the APA's requirements, the Commission ignored the numerous significant questions and concerns raised by commenters surrounding the rule's application to the digital assets industry and the broader impact that the rule could have on DeFi and additional technological developments built on that technology.  Third, the Commission inexcusably failed to analyze the economic effects of the Rule on this unique industry and instead sought to justify the Rule solely by reference to the costs and benefits for traditional financial markets.

### A. The Commission's Drastic Departure From the Well-Settled Definition of "Dealer" Exceeds Its Statutory Authority

84.     As explained above, for decades, the Commission interpreted the Exchange Act's definition of "dealer" to turn on the kinds of services a person offered to customers.  That approach comported with the statute, and it made sense.  It allowed market participants to determine *ex ante*, based on their business model and activities, whether they were dealers or traders.

85.     As Commissioner Peirce explained, the Dealer Rule "obliterates this distinction."  Peirce, *Dissenting Statement*.  Under the first new qualitative test, a trader now qualifies as a dealer simply by "[r]egularly expressing trading interest" at or near the best available sale and purchase price for the same security—conduct that traders regularly engage in as part of their own investment strategies.  And under the second new

qualitative test, a trader now qualifies as a dealer if the trader earns revenue primarily from capturing bid-ask spreads or by capturing other types of incentives for providing liquidity—conduct engaged in by numerous market participants who have no customers and do nothing else resembling traditional dealing. Rather than continuing to consider whether a person's regular business of trading "bears the hallmarks of dealing activity," *id.*, the Dealer Rule now sweeps in anyone whose trading activity provides more than "incidental" liquidity, Dealer R. at 14,945. As Commissioner Peirce noted, the Commission had never before stated "that liquidity provision alone by a person trading for its own account constitutes dealing activity or that trading activity becomes dealing activity merely because it has the effect of providing liquidity." Peirce, *Dissenting Statement.*

86.     This sudden shift to a focus on *post hoc* liquidity provision makes especially little sense for digital asset markets, because the DeFi ecosystem was specifically developed to enable the provision of liquidity *without* traditional, customer-facing intermediaries like dealers and market makers. Traders can contribute their digital assets to liquidity pools, but those contributions are passive and do not involve interfacing directly with other participants in the pool. And the transactions themselves are executed by operation of AMM software, not by some other intermediary. In short, by design, the traditional role of a "dealer[]" has been "eliminat[ed]" from these decentralized finance protocols. Consensys Comment at 5. Yet the Commission's new tests could potentially sweep *all* of the traders participating in liquidity pools—and even all AMM *software* protocols—into an expensive, burdensome, and ill-fitting regulatory regime.

36

87.     Compounding the disruption and uncertainty created by the new Dealer Rule, the Commission simultaneously warned the public that there are other, unspecified ways that someone might qualify as a dealer even if that person's activities did *not* meet the two new tests.  Dealer R. at 14,946.  In other words, under the new regime established by the Dealer Rule, market participants may be required to register as securities dealers if they meet the new tests, the longstanding historical test, or even some other, undefined test that the Commission has not yet articulated.  "[T]he 'dealer' definition is practically limitless."     Mark   T.   Uyeda,   *Dissenting   Statement*   (Feb.   6,   2024), https://www.sec.gov/news/statement/uyeda-statement-dealer-trader-020624.

88.     Indeed, implicitly acknowledging the sheer breadth and imprecision of the new standard, the Commission concluded that it needed to expressly exempt registered investment companies under the Investment Act from application of the Rule—explaining that they were already subject to "a comprehensive regulatory framework."  Dealer R. at 14,956-14,957.

89.     The Commission acknowledged in the adopting release that certain market participants—specifically principal trading firms or PTFs—who have never before been thought of as dealers may now be captured by the Commission's expansive new interpretation.  *See* Dealer R. at 14,940 ("The Commission recognizes that . . . PTFs may not engage in certain types of dealer activities . . . ."); Uyeda, *Dissenting Statement* ("[P]ersons are now subject to Commission enforcement, even though they have been operating under the same business model for a long time with the understanding that they were not dealers.").  But tellingly, the Commission saw this as a feature rather than a bug:

according to the Commission, the expansion of the definition well beyond its prior reach was warranted because "limited regulatory oversight of significant liquidity providers increases the difficulty and complexity for regulators to investigate, understand, and address significant market events."   Dealer R. at 14,940.   In other words, in the Commission's view, its unprecedented new interpretation of dealer was justified simply by the need to subject other groups of market participants to increased regulation.

90.    This is not the first time that the Commission has tried to widen its regulatory reach by reinterpreting statutory definitions.   In 2004, the Commission complained that hedge funds and other types of "private funds" were not required to register with the Commission, despite becoming "significant participants" in the securities markets and playing a role in "provid[ing] liquidity to th[ose] markets."   *Registration Under the Advisers Act of Certain Hedge Fund Advisers*, 69 Fed. Reg. 72,054, 72,056-72,060 (Dec. 10, 2004).   The Commission thus attempted to redefine "client" as used in the Investment Advisers Act to force the funds' managers, which had previously been exempt, to register as advisers.   *See Goldstein* v. *SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006).   The D.C. Circuit rejected this maneuver, explaining that the Commission could not "accomplish its objective" of "more comprehensive regulation" of private funds "by a manipulation of [the] meaning" of the statute's definition.   *Id.* at 882.

91.    The Commission tried a similar tack in 2014 as part of its attempt to implement Dodd-Frank.   Congress had directed the Commission to adopt new rules regulating the market for asset-backed securities, and to specifically require that certain "securitizers" of asset-backed securities retain a portion of the credit risk for assets that

they "transfer[], sell[], or convey[]." *See Loan Syndications & Trading Ass'n* v. *SEC*, 882 F.3d 220, 221 (D.C. Cir. 2018).  But the Commission decided to go further, promulgating a rule that imposed those requirements not just on the entities that transfer securitized assets, but also on third parties that provided advisory services and never actually held the securitized assets at any point in time.  *Id.* at 221-23.  As the D.C. Circuit explained, the Commission's "interpretation seem[ed] to stretch the statute beyond the natural meaning of what Congress wrote," and "the agencies' policy concerns cannot compel [the Court] to redraft the statutory boundaries set by Congress."  *Id.*

92.    Remarkably, despite recognizing that its new definition would capture previously-exempt market participants, the Commission made the conclusory assertion that the Dealer Rule was simply "intended to reflect the *longstanding distinction*" between traders and dealers under the Exchange Act.  Dealer R. at 14,945 (emphasis added).

### B.    The Commission Flouted the APA By Failing to Substantively Respond to Concerns From the Digital Assets Industry

93.    In response to the single, vague reference to the digital assets industry in a footnote in the Proposed Rule, commenters raised significant concerns about the impact that the proposal would have on the digital assets industry.  In adopting the Dealer Rule, the Commission barely acknowledged these concerns at all, and it refused to engage with them in substance.

### 1.    The Commission Never Clarified How the Rule Would Apply to Digital Markets

94.    Commenters raised significant concerns about "the ambiguity concerning the parties actually affected by" the Proposed Rule, particularly as it applies to digital asset markets, DEF Comment at 12, which would make the proposed rule the latest

"unpredictable threat of Commission enforcement" against members of the digital assets industry, a16z Comment at 14.  Yet the Commission never directly addressed these concerns, instead preferring to tap dance around the many questions pertaining to the application of the Rule's new tests to the digital asset community.

95.     Because the Commission only has authority to regulate dealers of *securities*, the threshold inquiry governing which digital asset market participants might be required to register under the Dealer Rule is whether transactions in the particular digital assets they hold and wish to trade are securities transactions.  That determination requires an intensive, fact-based assessment of the nature of the asset and the particular transaction, and one that is even more difficult for participants in digital asset markets given the novelty of those assets and the dearth of applicable precedent.  *See* a16z Comment at 2-3.  And as discussed above, the Commission has generally "fail[ed] to provide adequate guidance regarding the classification of digital assets as securities."  BA Comment at 1.  It similarly refused to provide any more clarity in this Rule.

96.     Instead, the Commission's only response was to generally acknowledge commenters' questions and then restate its position that the Rule "appl[ies] to the buying and selling of all securities, including crypto assets that are securities or government securities within the meaning of the Exchange Act."  Dealer R. at 14,960; *id.* at 14,950 n.134 ("The application of the [Dealer Rule] turns on whether a particular crypto asset is a security, as defined under the U.S. Federal securities laws.").

97.     There is no other industry for which there is such fundamental lack of regulatory clarity as to whether the Rule could even potentially apply to its members.  The

Commission's "we'll tell you later" approach does not meet the APA's requirements for adequate notice and reasoned decisionmaking; if the Commission is unwilling to provide the required clarity, it should have exempted digital assets altogether.

98. Commenters also raised numerous concerns and questions about how the new qualitative dealer standard would be (or even reasonably could be) applied to unique aspects of DeFi. *See supra* ¶¶ 67-69. Again, the Commission refused to respond to these questions, instead simply dismissing them in conclusory fashion: "While some commenters stated that the proposed rule[] should not apply to so called DeFi, whether there is a dealer involved in any particular transaction or structure (whether or not referred to as so-called DeFi) is a facts and circumstances analysis. There is nothing about the technology used, including distributed ledger technology-based protocols using smart contracts, that would preclude crypto asset securities activities from falling within the scope of dealer activity." Dealer R. at 14,960. In a veiled threat industry participants, the Commission asserted without explanation that "certain persons engaging in crypto asset securities transactions may be operating as dealers as defined under the Exchange Act" already. *Id.*

99. Commissioner Peirce again objected to the Commission's refusal to engage with the Rule's application to DeFi innovations. She recognized that the Dealer Rule "raises new questions about how the rule will apply in the context of" these innovations. Peirce, *Dissenting Statement*. As one example of an unanswered question, she posited: "AMM is a software protocol, who will have to register?" *Id.* And she criticized the majority for its failure to "engage seriously with these questions" based on its "hint[]" that some persons engaged in trading digital assets might be considered dealers already. *Id.*

100.   Due to the Commission's refusal to respond to comments, participants in the digital asset markets face intolerable uncertainty and the risk of the Commission deciding that (a) their transactions in given digital assets are securities transactions and/or (b) the innovations they use meet the Dealer Rule's new qualitative tests. This will leave individual "market participants exposed to *post hoc* second-guessing and 'gotcha' enforcement actions," with serious financial and compliance ramifications. BA Comment at 8.

### 2.   The Commission Never Meaningfully Responded to Concerns About Broader Effects on the Industry and Decentralized Finance

101.   In addition to concerns about the vagueness and uncertainty of the Dealer Rule's application to individual participants in the digital asset markets, numerous commenters raised concerns about the effects that the Proposed Rule would have across the industry and DeFi. Once again, the Commission failed to substantively respond to these comments in adopting the Dealer Rule.

### (a)   *Ramifications for Liquidity and Price Efficiency*

102.   Multiple commenters raised concerns that the Dealer Rule "may well drive firms to cease providing the very liquidity the safeguarding of which is the proposal's asserted core purpose." Consensys Comment at 17-18. That is because ambiguity about whether particular innovations—such as liquidity pools or AMM software—will trigger the Dealer Rule's tests will lead rational traders to look for alternatives that avoid the potential costs and regulatory restrictions.

103.   The Commission again chose to engage with these concerns only in the most superficial manner. The Commission generally acknowledged and did not dispute commenters' statements that the Rule "would harm liquidity in markets for crypto assets."

Dealer R. at 14,996.  But it did not address any of the substantive ramifications of reduced liquidity in these markets, such as increased volatility and systemic risk and decreased price discovery.  Instead, the Commission merely acknowledged the impact on a *single* kind of participant in digital asset markets—PTFs—and stated that "trading volumes in crypto asset markets could fall, harming the liquidity and efficiency of these markets," if "PTFs curtail their crypto asset trading activities."  *Id.*  The Commission thus refused to address or even acknowledge the impacts of the new dealer definition across other "individual [decentralized-exchange] participants."  a16z Comment at 14 (The Commission "homes in on PTFs, omitting any reference to the individual [decentralized-exchange] participants even while acknowledging that the Proposal 'could potentially capture a wide array of persons.'").

### (b)       *Ramifications for Competition*

104.     Because the threat of onerous dealer registration requirements could drive digital asset market participants out of the market entirely, commenters warned that the Rule would result "in concentrated and centralized control over [decentralized exchanges] in the hands of fewer market participants," a16z Comment at 13, therefore "tilting the competitive playing field towards incumbents" that could cover the registration costs, DEF Comment at 3; *see also* Consensys Comment at 7.

105.     The competitive impact could also manifest geographically.  The Commission takes a territorial approach to determining who must register as a dealer, *see Registration Requirements for Foreign Broker-Dealers*, 54 Fed. Reg. 30,013, 30,016-30,017 (July 18, 1989), yet declined to resolve how the Dealer Rule might apply to web-based protocols that have global reach and in many cases no single physical location.  The result, as commenters

43

warned, is that "foreign jurisdictions where market participants may have greater clarity as to the obligations accompanying digital asset transactions" would competitively benefit. a16z Comment at 10.

106.    Again, in response to these concerns specific to the digital asset markets, the Commission summarily claimed that the Dealer Rule's "effect on competition in crypto asset markets would be similar to the effects on competition already discussed for other markets."  Dealer R. at 14,996.  The Commission never addressed the fact that, for many digital asset market participants, the costs of compliance would be prohibitive or that foreign markets would be competitively advantaged.  Nor did the Commission address other concerns that unique and unworkable interpretations of broker-dealer custody and accounting rules previously adopted by the Commission for digital assets would make the new rule significantly costlier for the digital asset industry than the traditional securities industry.  *See* Global Digital Assets & Cryptocurrency Association Comment at 3-4 (May 27, 2022).  And in declining to carve the digital assets industry out of the Dealer Rule, the Commission made the bizarre and unsupported claim that exempting "market participants that deal in crypto asset securities" from dealer registration would lead to "negative competitive effects" across *all* markets because "market participants that deal in other types of securities would not enjoy such an exemption."  Dealer R. at 15,000.

### (c)    *Ramifications for Innovation and Everyday Americans*

107.    As noted above, multiple commenters also raised concerns about the ramifications that the Proposed Rule would have on innovation in DeFi and beyond into other technologies, which would hurt everyday Americans.  Specifically, market participants will avoid DeFi protocols subject to newfound regulatory risk, limiting their

value and usefulness, stifling further investment in and development of these platforms, and forcing users that relied on those protocols back to traditional markets.

108.    Even worse, as one commenter warned, such avoidance of DeFi protocols would seriously "hinder[] the United States' goal of becoming a leader in" next-generation internet, in the form of web3.   a16z Comment at 10.   DeFi protocols "serve as an infrastructure layer for all web3 applications, products, and services." *Id.*   Thus, a decrease in the use of these protocols would threaten the further development of the protocols for applications outside of DeFi, such as web3-based technologies that might, one day, enable the conversion of "all of the cash" in an American's wallet into foreign currency "every time [that American] traveled to a new country." *Id.* at 5-6.   It would also harm "the development of software tools and applications designed for DeFi protocols" that can aid "innovation in U.S. [and global] markets in general."   DEF Comment at 13.

109.    Again, the Commission offered no substantive response to any of this.   It simply gave lip service to commenters' concerns that adopting the Dealer Rule could "hinder innovation."   Dealer R. at 15,000.   But nowhere did the Commission grapple with the substance of the comments or explain why that substantial cost was justified by any supposed benefits of making digital asset market participants register as securities dealers.

**C.    The Commission's Assessment of the Costs and Benefits of the Dealer Rule for the Digital Assets Industry Was Deeply Inadequate**

110.    The Commission likewise failed to conduct an adequate economic analysis of the Dealer Rule as applied to the digital assets industry.   The Commission wholly failed to account for the costs of the Rule on participants in the digital asset markets, nor did it analyze the effects of the Rule on efficiency, competition, or capital formation for the digital

asset markets.  Instead, the Commission focused exclusively on attempting to justify the costs and benefits of the Dealer Rule in the context of conventional markets (particularly the U.S. Treasuries market).

### 1.     The Commission Admitted It Did Not Analyze the Costs of the Rule for the Digital Assets Industry

111.    By its own admission, the Commission did not even attempt to analyze the costs of the Dealer Rule on digital asset markets.  The Commission tried to explain this failure by claiming that it was "unable to estimate the number of crypto asset market participants who would be affected by the [Rule], because data do not allow us to match crypto asset security transactions to individual traders, especially across platforms." Dealer R. at 14,974.  That is a dodge that does not excuse the Commission's failure to fulfill its statutory economic analysis obligation.

112.    Given the public, transparent, and immutable nature of transactions conducted on distributed ledgers, the very data that the Commission claimed it did not have access to—tracing transaction activity associated with individual traders, whose activity is associated with publicly available "wallet" addresses on those ledgers—was readily available.  Indeed, the U.S. government has routinely matched digital asset transactions to specific users in law enforcement actions.  *See, e.g.*, Nicole Perlroth et al., *Pipeline Investigation Upends Idea That Bitcoin Is Untraceable*, N.Y. TIMES (June 9, 2021) (former Treasury Department official explaining that "[c]ryptocurrency allows us to use . . . tools to trace funds and financial flows along the blockchain"), https://www.nytimes.com/ 2021/06/09/technology/bitcoin-untraceable-pipeline-ransomware.html; *see also, e.g.*, *WalletExplorer.com: smart Bitcoin block explorer*, WALLETEXPLORER (tracking

transactions attributed to users' wallets) (accessed on Apr. 20, 2024), https://www.walletexplorer.com/.

113.   The Commission's excuse also falls flat in light of the fact that it did not request any particular data from members of the digital asset markets to assist it in conducting its required economic analysis.  If it truly needed data from members of the digital assets community that it could not reasonably obtain itself, the Commission should have reopened the comment period and solicited the data that it needed, as it has done in the past with rulemakings implicating the digital assets industry.  *See Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange"*, 88 Fed. Reg. 29,448, 29,452 (May 5, 2023) (reopening comment period for a different proposed rule, supplementing economic analysis, and soliciting various information from the digital assets industry "relevant to the Commission's analysis of New Rule 3b–16(a) Systems for crypto asset securities").  Instead, the Commission was content to keep the wool over its eyes.

### 2. The Commission Did Not Analyze the Effects of the Rule on Efficiency, Competition, and Capital Formation for the Digital Assets Industry

114.   The Commission not only failed even to estimate the costs that the Dealer Rule would impose on the digital asset markets, but it also completely omitted any analysis of the digital asset markets in its assessment of the Rule's anticipated effects on efficiency, competition, and capital formation.  *See* 15 U.S.C. §§ 78c(f), 78w(a)(2).  Commenters weighed in on each of these three statutory considerations that the Commission is required to analyze, but those comments too fell on deaf ears.

115.    As to efficiency, commenters explained that market participants would abandon using protocols that raise the prospect of dealer registration.  In turn, the "[l]iquidity lost" from the departure of market participants would "caus[e] [decentralized-exchange] trading to dry up," a16z Comment at 14, which would come with a litany of costs like increased "market concentration," "volatility," and "[s]ystemic [r]isk," DEF Comment at 9.  The Rule would have "the undesirable impact of forcing greater intermediation and centralization" as participants would be "discourage[d]" from "trading strategies and market structures designed to promote liquidity," thereby "reducing innovation and market efficiency." DEF Comment at 3.  Indeed, the Rule would threaten the development of web3-based innovations that would enhance efficiency in the digital asset markets by reducing "downtime" and increasing "security" when transacting via DeFi protocols.  a16z Comment at 14.  Yet the Commission did not address the Rule's impacts on trading strategies, risks, and innovations unique to the digital assets industry that pose problems for the efficiency of digital asset markets.

116.    As to competition, commenters explained that the Rule's "approach of painting the digital assets market with the same brush used for the traditional securities market is flawed and will stifle . . . competition" for many of the same reasons that they explained it would harm liquidity provision.  *See, e.g.*, BA Comment at 9.  The compliance burdens with dealer registration would decrease competition by favoring well-funded incumbents in digital asset markets. *See supra* ¶¶ 65, 104.

117.    Despite these concerns, the Commission summarily asserted that the Dealer Rule would "level[] the competitive playing field between liquidity provision conducted by

entities that are currently registered as dealers and government securities dealers and by entities that are not." Dealer R. at 14,996. Remarkably, the Commission made the conclusory statement that the "effect on competition in crypto asset markets would be similar to the effects on competition already discussed for other markets." *Id.* Again, even on its own conclusory terms, this was contrary to the Commission's acknowledgement that the net capital requirements imposed on dealers would be disproportionally higher for participants in the digital asset markets. *Id.* at 14,988 & n.573.

118.    Finally, the Commission's response to concerns about capital formation in the context of the digital asset markets was similarly deficient. *See, e.g.*, Global Digital Asset & Cryptocurrency Association Comment at 6 ("Given the significance of holdings of digital assets to 40 million Americans, we think it behooves the Commission to give consideration to whether its obligation to foster capital formation is consistent with the adoption of rule interpretations that appear so destructive to capital."). One commenter went so far as to say that, "[f]or DeFi market participants especially, the message from the Commission seems clear: they should not operate at all." DEF Comment at 14. Yet the Commission merely generalized that the Rule's "effect on capital formation" will be "mixed." Dealer R. at 14,997. Here, again, the Commission did not provide any analysis on the devastating costs to capital formation in the digital asset markets, including the existential cost that participants may not even operate in these markets going forward.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Not in Accordance with Law and in Excess of Statutory Authority — Unlawful Interpretation of "Dealer" and "Government Securities Dealer")
### 5 U.S.C. § 706

119.     Plaintiffs repeat and incorporate by reference all of the above allegations.

120.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory . . . authority," *id.* § 706(2)(C).

121.     The Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account," 15 U.S.C. § 78c(a)(5)(A), with the exception that "dealer" "does not include a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business"—*i.e.*, a trader, *id.* § 78c(a)(5)(B); *see also id.* § 78c(a)(44) (similarly defining "government securities dealer").

122.     Consistent with the intent of Congress, courts and the Commission for decades have looked at whether a person was offering services to customers to determine if that person was a "dealer" under the Exchange Act.  And market participants relied on this understanding of the meaning of "dealer" to determine, *ex ante*, if their business model and conduct met the definition and required them to register as dealers.

123.     The Commission's new interpretation conflicts with the statute and defies 90 years of past precedent and reliance by market participants.  Now, rather than focusing on how a person holds themselves out to customers to determine who is a dealer, the

Commission looks to whether a person's trading of securities for their own investment purposes has the *effect* of providing more than "incidental" liquidity to securities markets.

124.    Whatever the Commission's policy objectives for the drastic reinterpretation of the statutory term "dealer," the Commission cannot "accomplish [them] by a manipulation of meaning." *Goldstein*, 451 F.3d at 882.  That violates the law and exceeds the Commission's statutory authority.

125.    For these reasons, the Commission's adoption of the Dealer Rule was not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

**COUNT II**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Respond to Comments and Engage in Reasoned Decisionmaking)**
5 U.S.C. § 706

126.    Plaintiffs repeat and incorporate by reference all of the above allegations.

127.    Under the APA, federal agencies must "articulate a satisfactory explanation for [their] action[s]" and establish "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted); *see Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) ("Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made.").

128.    To "determine whether the agency considered the relevant factors, the court must decide whether the agency addressed any significant points . . . raised by the public comments." *Mexican Gulf Fishing Co.*, 60 F.4th at 971 (internal quotations omitted).  The

APA "does not grant the Government free license to interpret comments in a manner that ducks the hard questions" or to "bury its head in the sand." *Id.* at 973.

129.    Here, the Commission both ducked hard questions and buried its head in the sand, ignoring many of the comments that members of the digital assets industry raised and offering cursory responses to the ones it did acknowledge.  As its only response to the many comments and questions from the unique and innovative digital assets industry, the Commission simply adopted the mantra that "nothing about [this] technology" would preclude digital asset transactions from falling within the ambit of the Rule.  *Id.* at 14,960. The Commission hardly acknowledged commenters' concerns about the harmful impact the vague Rule would have on the digital assets industry, by decreasing liquidity, increasing prices, stifling competition and innovation, and otherwise limiting access to financial resources.  Instead, the Commission focused entirely on an analysis of the fundamentally different traditional financial markets.

130.    The Commission's failure to acknowledge—much less meaningfully respond to—the significant comments from members of the diverse digital assets industry falls drastically short of the APA's requirement of reasoned decisionmaking and renders the Dealer Rule arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

**COUNT III**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Consider Important Aspect of the Problem)**
5 U.S.C. § 706

131.    Plaintiffs repeat and incorporate by reference all of the above allegations.

132.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133.     An agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *State Farm Mut. Auto. Ins.*, 463 U.S. at 43. "This includes, of course, considering the costs and benefits associated with the regulation," if adopted. *Mexican Gulf Fishing Co.*, 60 F.4th at 973.

134.     The Commission's rulemaking process and adoption of the Dealer Rule is a textbook example of an agency's failure to consider an important aspect of the problem. While the Commission was focused on solving for a problem that it perceived to exist in the traditional markets (and, in particular, the Treasuries market), it never addressed whether that same problem existed in the digital asset markets. With its myopic focus on the traditional financial markets, the Commission never offered a purported justification for applying the Rule to digital assets.

135.     Participants in the digital assets industry expressly warned the Commission about the myriad harmful effects that the Proposed Rule would have on the industry, if adopted—including stifling markets' innovative methods for generating liquidity, increasing costs, decreasing access and competition, and even driving many participants from the market altogether. These harmful effects arise precisely *because* of many of the unique features of digital assets markets. But rather than acknowledging those unique features and the problems posed by attempting to apply the Dealer Rule in this unique context, the Commission simply asserted, without any explanation, that the effects of the

Final Rule on the digital asset markets would be no different than the effects on traditional markets.

136.    As a result, the Commission has thrown an entire industry into a state of regulatory confusion and has jeopardized its future success.  Its failure to adequately account for the effects of a rule upon an *entire industry* violates the APA.

137.    For these reasons, the Commission's adoption of the Dealer Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

**COUNT IV**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Adequately Explain Departure from Prior Position)**
5 U.S.C. § 706

138.    Plaintiffs repeat and incorporate by reference all of the above allegations.

139.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

140.    When an agency departs from its prior position, the requirement that it provide a reasonable explanation for its actions "ordinarily demand[s] that it display awareness that it *is* changing position."  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And the agency is required to provide a more detailed justification for its change in position when "the new policy rests upon factual findings that contradict those that underlay its prior policy" or "when [the] prior policy has engendered serious reliance interests."  *Id.*

141.    The Commission failed to do so here.  In fact, the Commission insists that it has not changed its position at all.  *See* Dealer R. at 14,945.  But the Commission's new interpretation of "dealer," which looks at the after-the-fact effects of a person's trading activity, plainly contradicts its own prior interpretation of "dealer," which focused on whether a person was offering its services to customers.  For the past 90 years, market participants have relied on the Commission's prior interpretation that was consistent with the statutory scheme, making it imperative that the Commission not only acknowledge its departure from past practice but also provide a more detailed explanation for its change in position.

142.    For these reasons, the Commission's adoption of the Dealer Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

### COUNT V
### Administrative Procedure Act
### (Arbitrary, Capricious, and Not in Accordance with Law — Deficient Economic Analysis)
### 5 U.S.C. § 706

143.    Plaintiffs repeat and incorporate by reference all of the above allegations.

144.    Under the APA, a reviewing court shall hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

145.    Under Section 3(f) of the Exchange Act, the Commission is required to consider the impact of a rule on "efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  Similarly, under Section 23(a)(2), the Commission must consider the "impact any

such rule . . . would have on competition."  *Id.* § 78w(a)(2).  Failure to sufficiently conduct such a review renders Commission action "not in accordance with law" under the APA.

146.   In adopting the Dealer Rule, the Commission failed to satisfy these requirements s.  The Commission did not make any effort to quantify the costs the Dealer Rule would impose on digital asset markets or to analyze the unique impacts of the Rule on participants in the digital assets markets.  Nor did the Commission even identify any specific *benefits* of subjecting the digital assets industry to regulation under the newly expanded definition of "dealer."

147.   The Commission tried to absolve itself of responsibility for its inadequate economic analysis by stating that it could not identify which digital asset market participants would be swept under the Rule.  But any purported difficulty in estimating the economic effects of the Rule does not excuse the Commission from failing to take them into account.  The Commission's excuse also falls flat given that it did not even analyze the information that it had received from the digital assets industry nor request that the industry members provide information and data that the Commission needed to conduct an adequate economic analysis.

148.   For these reasons, the Commission's adoption of the Dealer Rule was arbitrary, capricious, and not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

## COUNT VI
## Administrative Procedure Act
**(Without Observance of Procedure Required by Law — Failure to Provide Adequate Notice and Comment)**
5 U.S.C. § 553

149.    Plaintiffs repeat and incorporate by reference all of the above allegations.

150.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside" final agency action that is "without observance of procedure required by law."   5 U.S.C. § 706(2)(D).

151.    The APA requires that an agency issue a notice of proposed rulemaking that provides for a meaningful comment period, in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."   5 U.S.C. § 553(c).   Interested parties are able to focus their submissions because the APA requires an agency to publish in its proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

152.    The Commission failed to comply with the APA notice requirements.  In the Proposed Rule, the Commission's only mention of the digital assets industry was confined to a single footnote.  That glancing reference did not provide members of the digital assets industry adequate notice of whether or how the Proposed Rule would apply to them.  The final Dealer Rule does nothing to resolve the ambiguity with respect to which participants in the digital asset markets the Rule purports to reach and how the Rule would apply given the unique features of the digital assets ecosystem.  Because the Commission has not provided any such explanation, the Commission has failed to provide adequate notice to

potentially affected participants in the digital asset markets, let alone given such participants a meaningful opportunity to respond to these regulatory developments.

153.    For these reasons, the Commission's adoption of the Dealer Rule was without observance of procedure required by law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Dealer Rule must be held unlawful and set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and provide the following relief:

   (i)    A declaratory judgment that the Dealer Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the APA, *see* 5 U.S.C. § 706(A);

   (ii)   An order vacating and setting aside the Dealer Rule in its entirety pursuant to the APA, *see* 5 U.S.C. § 706(2);

   (iii)  An order enjoining the Commission from enforcing the Dealer Rule against Plaintiffs' members and other digital assets industry participants;

   (iv)   An order issuing all process necessary and appropriate to delay the effective date and implementation of the Dealer Rule pending the conclusion of this case;

   (v)    An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

   (vi)   Such other and further relief that the Court deems just and equitable.

Dated:  April 23, 2024              Respectfully submitted,

                                    /s/ *Randy D. Gordon*
                                    Randy D. Gordon (TX Bar No. 00797838)
                                    John S. Polzer (TX Bar No. 24042609)
                                    Roger C. Diseker (TX Bar No. 00787371)
                                    Christopher A. Brown (TX Bar No. 24086265)
                                    Joakim G. Soederbaum (TX Bar No. 24091338)
                                    DUANE MORRIS LLP
                                    777 Main Street, Suite 2790
                                    Fort Worth, TX 76102
                                    Tel:  (817) 704-1000
                                    Fax:  (817) 887-2304
                                    RDGordon@duanemorris.com
                                    JSPolzer@duanemorris.com
                                    RDiseker@duanemorris.com
                                    CABrown@duanemorris.com
                                    JSoederbaum@duanemorris.com

                                    Jeffrey B. Wall*
                                    Judson O. Littleton*
                                    Elizabeth A. Rose*
                                    Oliver W. Engebretson-Schooley*
                                    Cooper F. Godfrey*
                                    SULLIVAN & CROMWELL LLP
                                    1700 New York Avenue NW, Suite 700
                                    Washington, D.C. 20006-5215
                                    Tel:  (202) 956-7500
                                    Fax:  (202) 293-6330
                                    wallj@sullcrom.com
                                    littletonj@sullcrom.com
                                    rosee@sullcrom.com
                                    engebretsono@sullcrom.com
                                    godfreyc@sullcrom.com

                                    *Counsel for Plaintiffs Crypto Freedom Alliance of
                                    Texas and Blockchain Association*

                                    **Pro hac vice* application forthcoming*