## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **CRYPTO FREEDOM ALLIANCE OF TEXAS, et al.,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Case No. 4:24-cv-00361-O** |
| **SECURITIES AND EXCHANGE COMMISSION, et al.,** | § § § | |
| **Defendants.** | § § | |

## <u>MEMORANDUM OPINION & ORDER</u>

Before the Court are Crypto Freedom Alliance of Texas, et al.'s ("Plaintiffs") Motion for Summary Judgment (ECF No. 28), filed May 17, 2024; the Securities and Exchange Commission, et al.'s ("Defendants" or "SEC") Cross-Motion for Summary Judgment (ECF No. 38), filed June 26, 2024; Plaintiffs' Reply and Opposition (ECF No. 44), filed July 29, 2024; and Defendants' Reply and Opposition (ECF No. 46), filed August 30, 2024. Additionally, the Court was presented amicus briefs by Paradigm Operations LP (ECF No. 35) and Better Markets, Inc. (ECF No. 43).

The Court heard oral arguments on the above-referenced filings on November 14, 2024.[1] Having considered the applicable law, the Court concludes that Defendants engaged in unlawful agency action taken in excess of their authority. Therefore, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 28) and **DENIES** Defendants' Cross-Motion for Summary Judgment (ECF No. 38).

---

[1] Min. Entry, Nov. 14, 2024, ECF No. 48.

## I.    BACKGROUND[2]

The Court hereby incorporates Background Part A of its Order in the Related Case.[3]  There, the Court walks through the relevant background of the SEC's promulgation of the final rule ("Dealer Rule" or "Rule") at issue here and in the Related Case.

Plaintiffs here are two non-profit organizations that challenge the Dealer Rule.  Plaintiff Crypto Freedom Alliance of Texas is a 501(c)(6) non-profit organization that "advocates for the responsible development of digital assets policies in Texas" to promote "innovation and economic growth."[4]  Similarly, Plaintiff Blockchain Association is a 501(c)(6) non-profit organization "dedicated to promoting a pro-innovation policy environment for the digital assets economy" and "is comprised of leading software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem."[5]

The digital assets industry operates through "a novel trading model that allows peer-to-peer trading and direct access to market liquidity" without the need for dealer intermediaries. Crypto assets—also known as "digital assets"—function through a "model of decentralized finance" ("DeFi").  DeFi "relies on distributed ledgers—decentralized networks [or] blockchains that record and publish the history and details of digital asset transactions."  These transactions are performed "through protocols and 'smart contracts' built with open-source software that participants can freely inspect, allowing a trader to know in advance exactly how and when a transaction will be executed and at what cost."  To guarantee liquidity, the industry has generated "'liquidity pools' that crowdsource digital assets, so that any user can trade a digital asset he or

---

[2] Unless otherwise indicated, all facts are taken from the parties' summary-judgment briefing.  There is no indication in the summary-judgment record or elsewhere that the parties disagree as to the relevant facts.
[3] Order 2–4, Nov. 21, 2024, ECF No. 46, *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-cv-00250 (N.D. Tex) (the "Related Case").
[4] Pls.' Compl. ¶ 13, ECF No. 1.
[5] *Id.* ¶ 14.

she holds for another asset available in the pool." These liquidity pools utilize "software that automatically adjusts prices as the makeup of assets in the pools shifts." As a result, users "no longer need to rely on dealers to quote prices, advise on trades, settle transactions, or take custody of assets." Plaintiffs maintain that "[a]lthough the software substitutes for a dealer in performing these functions, it is merely transparent, open-source, automated code, not a dealer itself."

As stated in the Court's Order in the Related Case, the SEC promulgated the Dealer Rule broadly expanding the definition of "dealer" under the Securities Exchange Act ("Exchange Act"). *See generally Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*, 89 Fed. Reg. 14938 (February 28, 2024) (to be codified at 17 C.F.R. pt. 240). In Plaintiffs' words, this Rule "is so broad that it could sweep in traders and other participants in DeFi protocols, despite the fact that these markets innovated to operate without the need for dealer intermediation." Concerned with the Dealer Rule's "sweeping and arbitrary nature,"[6] Plaintiffs sued Defendant SEC and Defendant Gary Gensler, the SEC's Chair.[7] Plaintiffs raise numerous claims in their Complaint, including that the SEC's promulgation of the Rule was in excess of its authority under 5 U.S.C. § 706(2)(C),[8] that the Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A),[9] and that the SEC failed to comply with notice requirements under 5 U.S.C. § 553(c).[10] Now before the Court are the parties' cross-motions for summary judgment, which are ripe for review.

---

[6] *Id.* ¶ 15.
[7] *Id.* ¶¶ 18–19.
[8] *Id.* ¶¶ 119–25.
[9] *Id.* ¶¶ 126–48.
[10] *Id.* ¶¶ 149–53.

## II.    LEGAL STANDARDS

The Court hereby incorporates the legal standards of its Order in the Related Case.[11]  There, the Court provides the appropriate summary-judgment and Administrative Procedure Act ("APA") standards through which the Court will review the instant case.[12]

## III.    ANALYSIS

Plaintiffs provide several independent reasons that the Dealer Rule violates the APA, requiring the Court to vacate or "set aside" the Rule.[13]  Plaintiffs first argue that the Dealer Rule constitutes unlawful agency rulemaking because it exceeds the SEC's statutory authority to regulate securities dealers.[14]  They specifically argue that the SEC, by way of the Rule, erroneously "expands the meaning of 'dealer' beyond what the statutory text, structure, and context" allow.[15]  Second, Plaintiffs argue that the SEC's promulgation of the Dealer Rule as it applies to digital assets markets was arbitrary and capricious and thus violated its obligation to engage in reasoned decisionmaking.[16]  Because there is no genuine dispute regarding material facts and because statutory interpretation is a question of law, the Court concludes that the SEC exceeded its statutory authority by enacting such a broad definition of dealer untethered from the text, history, and structure of the Exchange Act.

The Court hereby incorporates Analysis Part A of its Order in the Related Case.[17]  In that Order, the Court concluded the Rule's definition of "dealer" is an unlawful expansion of the SEC's

---

[11] Order 5–6, Nov. 21, 2024, ECF No. 46, *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-cv-00250 (N.D. Tex.).
[12] *Id.*
[13] Pls.' Br. in Supp. of Mot. for Summ. J. 5, ECF No. 29.
[14] *Id.* at 18.
[15] *Id.*
[16] *Id.*
[17] Order 7–15, Nov. 21, 2024, ECF No. 46, *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-cv-00250 (N.D. Tex.).

statutory authority for several reasons.[18]  First, the Court held that the Rule runs afoul of the Exchange Act's text, specifically its definitions of "dealer" and "broker" and its trader exception.[19]  Likewise, the Court examined the historical context and meaning of a "dealer" and concluded that implicit within traditional dealing activity was the buying and selling of securities to *customers*.[20]  Also, the Court determined the Rule's head-turning exclusions—namely, that certain institutions such as the Federal Reserve are excluded from the Rule's provisions—are evidence of its overbreadth.[21]  Further, the Court held that the Rule does not comport with the structure of the Exchange Act.[22]  Finally, the Court determined that the inconsistent results of regulating private funds as dealers further demonstrate the SEC exceeded its statutory authority.[23]

Although the parties' excess-of-authority arguments in both cases significantly overlap, the Court addresses an additional argument Plaintiffs advance in the instant case.  Plaintiffs agree with the plaintiffs in the Related Case "that dealers 'buy[] and sell[] securities to customers for the profit thereon,'"[24] and that the SEC's departure from this core component of dealer conduct proves to be fatal to the Dealer Rule.[25]  Plaintiffs here, however, concentrate "on an *additional* aspect of the fundamental problem with the Rule's expansive reinterpretation of 'dealer.'"[26]  They assert that the "business" of dealing has always included "services offered" to investors, "*not* merely engaging in trading activities for a person's own investing or trading objectives," which they

---

[18] *Id.*
[19] *Id.* at 7–10.
[20] *Id.* at 10–13.
[21] *Id.* at 12.
[22] *Id.* at 13–14.
[23] *Id.* at 14–15.
[24] Pls.' Combined Reply Br. in Supp. of Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J. 13, ECF No. 44 (alterations in original) (quoting *Schafer v. Helvering*, 299 U.S. 171, 174 (1936)).
[25] *Id.*
[26] *Id.* at 14 (emphasis in original).

contend is not "a service of any sort."[27]   Accordingly, Plaintiffs argue that the Dealer Rule's "departure from that long-held understanding" is an additional reason the SEC has exceeded its statutory authority.[28]  The Court agrees.

Congress defined "dealer" as "any person engaged in *the business* of buying and selling securities" for his "own account."  15 U.S.C. § 78c(a)(5)(A) (emphasis added).  By contrast, for nearly the last 100 years, it has been commonly understood that anyone who buys and sells securities "*not* as a part of a regular business" is a trader—not a dealer—under the Exchange Act. *Id.* § 78c(a)(5)(B) (emphasis added); *see Schafer v. Helvering*, 299 U.S. 171, 174 (1936) (A dealer is not one who merely "purchase[s] solely in expectation of a rise in the market, for the partnership's own account for resale, to any buyer, at a profit.").  Now, Plaintiffs argue that because the Rule defines anyone engaging in trading activities that affect market liquidity as a "dealer," the commonly understood statutory distinction between a "trader" and a "dealer" is practically nonexistent.[29]

To begin, the Dealer Rule contains two qualitative tests to assess whether "a person will be determined to be engaged in a regular pattern of providing liquidity to other market participants '*as part of a regular business*.'"[30]  A person is a dealer under the first test if he "[r]egularly express[es] trading interest that is at or near the best available prices on both sides of the market for the same security, and that is communicated and represented in a way that makes it accessible to other market participants."[31]  The second test examines whether someone is "[e]arning revenue

---

[27] *Id.* (emphasis in original).
[28] *Id.*
[29] *Id.*
[30] *Further Definition of "As a Part of a Regular Business*," 89 Fed. Reg. at 14944 [hereinafter "Final Rule"] (emphasis added); Pls.' App. in Supp. of Mot. Summ. J. 60, ECF No. 30 (emphasis added).
[31] Final Rule, 89 Fed. Reg. at 14944; Pls.' App. in Supp. of Mot. Summ. J. 60, ECF No. 30.

primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest."[32]

This leads the Court to the questions of what exactly it means to engage in the "*regular business*" of dealing under the Exchange Act and, more importantly, whether the Rule's qualitative tests comport with that meaning. Defendants point to two Eleventh Circuit cases for the proposition that the Rule's definition of "regular business" is consistent with the Exchange Act's dealer definition.[33] *See SEC v. Almagarby*, 92 F.4th 1306 (11th Cir. 2024); *SEC v. Keener*, 102 F.4th 1328 (11th Cir. 2024). The court in *Almagraby* noted that "the distinction between dealers and traders remains crucial for regulatory purposes" but that "[p]roviding market liquidity is itself a trading strategy, a fact that makes line-drawing between dealers and traders difficult." 92 F.4th at 1315–16. In that case, the court determined that "[t]he *volume* and *regularity* of Almagarby's transactions support the ruling that he was 'in the business' of buying and selling securities." *Id.* at 1317 (emphasis added). The court defined "business" as "a particular occupation or employment habitually engaged in for *livelihood* or *gain*." *Id.* (emphasis in original) (citations omitted). Because Almagarby's "*entire* business model was predicated on the purchase and sale of securities," the court concluded he was a "dealer" under the Exchange Act. *Id.* at 1317–18 (emphasis in original) (citation omitted). The court in *Almagarby* did not broadly conclude that merely engaging in extensive trading *alone* qualifies someone as a "dealer," as the Dealer Rule purportedly does.[34]

---

[32] Final Rule, 89 Fed. Reg. at 14944; Pls.' App. in Supp. of Mot. Summ. J. 60, ECF No. 30.
[33] Defs.' Combined Br. in Supp. of Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. 16, ECF No. 39.
[34] Pls.' Combined Reply Br. in Supp. of Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J. 11, ECF No. 44.

The Eleventh Circuit reached a similar conclusion in *Keener*. There, the court held that "[t]he nature, volume, regularity, and frequency of Keener's transactions render[ed] him a dealer." *Keener*, 102 F.4th at 1334. The court explained that the Exchange Act "defines dealers by their function, as being '*in the business* of buying and selling securities.'" *Id.* (emphasis in original) (quoting 15 U.S.C. § 78c(a)(5)(A)). Of course, like *Almagarby*, the Eleventh Circuit did not hold that regularly buying and selling securities *alone* renders someone a dealer. And, as explained in the Related Case, *Almagarby* limited its holding to the defendants' specific conduct, *i.e.*, underwriting, and *Keener* applied *Almagarby* because of factual similarities between the two cases.[35] At best, these cases demonstrate that courts examine a wide variety of indicia to determine whether someone is "engaged in the business of buying and selling securities" and thus a dealer—not only whether someone trades in a way that incidentally provides liquidity. 15 U.S.C. § 78c(a)(5)(A).

Critically, the Exchange Act "does not make every securities trader who makes money through buying and selling of securities a dealer." *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 988 (S.D. Tex. 2022) (internal quotation marks and citation omitted). Indeed, "the plain meaning of 'regular business' as used in Section 78c(a)(5)(B) is the business of dealing, *i.e.* the regular business of providing *dealer services* to others such as soliciting investor clients, handling investor clients' money and securities, and rendering investment advice to investors." *Id.* at 989 (emphasis added) (internal quotation marks and citation omitted); *see Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016) ("To be considered a dealer, a person must be engaged in the securities business, *such as* soliciting investor clients,

---

[35] Order 14–15, Nov. 21, 2024, ECF No. 46, *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-cv-00250 (N.D. Tex).

handling investor clients' money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." (emphasis added)).

Importantly, sources published near the time of the Exchange Act's enactment confirm that the meaning of the "regular business" of dealing refers to a market intermediary offering to buy and sell securities to customers as a *regular service*, not just affecting market liquidity.  Plaintiffs point to a 1933 treatise indicating that a dealer "sells to his customers . . . securities which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere at a profit."[36]  CHARLES H. MEYER, THE LAW OF STOCKBROKERS AND STOCK EXCHANGES 32–33 (1933).  Plaintiffs also quote a 1936 Supreme Court opinion articulating that a dealer is someone who "as a merchant, buys and sells securities to *customers* for the profit thereon."[37]  *Schafer*, 299 U.S. at 150 (emphasis added).

And yet, the Dealer Rule departs from these commonly recognized and historical interpretations by broadly defining a dealer as someone who "engage[s] in a 'regular' pattern of buying and selling securities that *has the effect of providing liquidity* to other market participants."[38]  As Plaintiffs argue, *neither* of the Rule's qualitative tests comport with or account for Exchange Act's distinction that, unlike dealers, traders do not engage in the *regular business* of securities dealing.  Based on the above-mentioned case law, courts consider a variety of indicia of dealer conduct to determine who is a dealer under the Exchange Act, many of which sound in service-related activities.  Defendants even admit this.  In their words, courts have "assessed the totality of facts and circumstances bearing on whether a firm acted as a dealer and concluded that

---

[36] Pls.' Br. in Supp. of Mot. for Summ. J. 20, ECF No. 29; Pls.' App. in Supp. of Mot. Summ. J. 271–72, ECF No. 30.
[37] Pls.' Br. in Supp. of Mot. for Summ. J. 20, ECF No. 29.
[38] Final Rule, 89 Fed. Reg. at 14944; Pls.' App. in Supp. of Mot. Summ. J. 60, ECF No. 30.

*other factors*—not just the absence of customers—weighed against classification as a dealer."[39] Thus, as Defendants concede, courts not only consider whether one's conduct affects market liquidity because, of course, that would necessarily render the Exchange Act's distinction between "dealer" and "trader" void. And that is exactly what the Dealer Rule does in effect—it makes no room for any fact-specific nuances in the difference between a dealer and trader. As one of the dissenting Commissioners explained, the SEC has never "before stated categorically that liquidity provision alone by a person trading for its own account constitutes dealing activity or that trading becomes dealing activity merely because it has the effect providing liquidity."[40]

The Rule as it currently stands *de facto* removes the distinction between "trader" and "dealer" as they have commonly been defined for nearly 100 years. The Court refuses to allow such a broad expansion of the Exchange Act by way of this Rule. In addition to the reasons provided in the Related Case, the Court concludes that the Dealer Rule impermissibly exceeds the SEC's statutory authority. In light of this conclusion, the Court need not, and does not, reach Plaintiffs' remaining arguments that the Dealer Rule is arbitrary and capricious under the APA.

## IV.    REMEDY

Now, the proper remedy. The Court hereby incorporates its remedies discussion in the Related Case, in which the Court examined the seriousness of the deficiencies of the action and the disruptive consequences of vacatur.[41] Like the Related Case, the Court also determines that vacatur is the proper remedy in this case.

---

[39] Defs.' Combined Br. in Supp. of Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. 22, ECF No. 39 (emphasis added).

[40] Pls.' App. in Supp. of Mot. Summ. J. 203 (Peirce, dissenting statement), ECF No. 30.

[41] Order 16–20, Nov. 21, 2024, ECF No. 46, *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-cv-00250 (N.D. Tex).

Among other forms of relief, Plaintiffs here request that the Court vacate and set aside the Dealer Rule in its entirety.[42]  "Under section 706 of the APA, when a court holds that an agency rule violates the APA, it shall—not may—hold unlawful and set aside [the] agency action."  *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024) (internal quotation marks and citation omitted).  This includes when an agency "has exceeded its statutory authority in adopting the Final Rule."  *Id.*  Here, "[b]ecause the promulgation of the Final Rule was unauthorized, no part of it can stand."  *Id.*  Therefore, vacatur is appropriate.

## V.    CONCLUSION

For the reasons discussed, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment, **DENIES** Defendants' Cross-Motion for Summary Judgment, and **VACATES** the Final Rule. A separate final judgment shall issue as to the appropriate parties and claims.

**SO ORDERED** this **21st day** of **November, 2024**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE

---

[42] Pls.' Compl. ¶ 83, ECF No. 1; Pls.' Br. in Supp. of Mot. for Summ. J. 18, ECF No. 29.

11